ED. H. HICKS, Exec'r. *v.* THOS. E. SKINNER and wife and others.

A purchaser at execution sale does not occupy the same ground that a purchaser of the legal title for value and without notice, does; the former buys subject to all equities against the defendant, whether he knows of them or not.

An ante-nuptial contract, entered into between a husband whose domicil was in North Carolina and a wife whose domicil was in New York, and which was duly registered in New York, but not in North Carolina, is good against the creditors of the husband, although the property was removed to North Carolina, and changed from what it originally was when the contract was signed.

This was a CIVIL ACTION, to subject a certain fund in the hands of B. F. Moore, Esq., to the payment of a judgment obtained by the plaintiff, and for other purposes, tried before his Honor, *Judge Tourgee,* at the Special (January) Term, 1874, of WAKE Superior Court.

It had been referred to Commissioner J. J. Davis, who reported the facts, and the case was tried in the Court below on exceptions to that report. His Honor being of opinion with the plaintiff, decreed accordingly, from which decree the defendants appealed.

In this Court, the principal inquiry was as to the equities of the *feme covert* defendant, to the fund reported; and all the facts bearing on that question are fully set out in the opinion of Justice RODMAN, and in the dissenting opinion of Justice BYNUM.

*Moore & Gatling,* for appellants.
*Smith & Strong, Fowle, Haywood* and *Batchelor,* contra.

RODMAN, J. The fund in controversy represents by agreement of the parties, a certain lot in Raleigh and certain furniture. The plaintiff claims title by purchase at a sale under execution at the instance of one Holleman, who recovered

judgment against Thomas E. Skinner at March Term, 1867, of Wake Superior Court. The sale was on 30th March, 1868. The plaintiff is also a judgment creditor of Thomas E. Skinner and of Charles W. Skinner.

This is the plaintiff's title, and it is clear, that if the property was legally in Thomas E. Skinner, as plaintiff contends it was, his title is good, unless it is defeated by some equity which the law will uphold against him. It must be borne in mind that he is a purchaser at execution sale, and that such a purchaser does not occupy in this State, the same ground that a purchaser of the legal title for value, and without notice, does. Such a purchaser gets a title unaffected by any contrary equity; but a purchaser under execution, buys subject to all equities against the defendant, whether he knows of them or not. If therefore there had been no conveyance to Womble, and the legal title had been in Thomas E. Skinner at the time of the plaintiff's purchase, he would have bought just as he did, subject to all equities against Thomas E. Skinner. *Freeman* v. *Hill*, 1 D. & B. Eq., 389; *Polk* v. *Gallant*, 2 D. & B. Eq., 395, *Vannoy* v. *Martin*, 6 Ire. Eq., 169; *Johnson* v. *Lea*, Bus. Eq., 43.

Of course this does not mean literally *all* equities which would be good against the defendant in the execution. It must be limited to equities *bona fide* created by him, and not fraudulent either in fact or by construction of law, as to his creditors. *Davidson* v. *Cowan*, 1 Dev. Eq., 470.

The defendant, Mrs. Anne E. Skinner, contends that she had an equitable claim to the property, which was valid against her husband, Thomas E. Skinner, which was *bona fide*, and not fraudulent as to his creditors; and which was consequently valid against them, and will be upheld against the title of the plaintiff.

This equity she bases upon the facts found by the referee; and in order to pass on it, it will be necessary to review the material facts which he finds.

The lot was conveyed to Thomas E. Skinner in September,

1859, by deed from A. M. Lewis and others. The considera-tion recited is $6,000. We will not stop here now to consid-er with whose money this consideration was paid, or any con-sequences which may flow from its payment by one person or another. On 30th October, 1865, Thomas E. Skinner convey-ed the lot and certain furniture then in the dwelling on it, to Jordan Womble in trust for the separate use of the said Anne, his wife. At that time Thomas E. Skinner was insolvent, and the plaintiff contends that this deed was fraudulent and void as to his creditors, as being either without consideration, or upon a false and fraudulent consideration.

Without going at present, into a farther statement of the facts on which Mrs. Skinner grounds her equity, we stop here to examine this deed to Womble, and ascertain its exact weight and bearing in this controversy. The deed (which is made an exhibit) recites, in substance, that " *Whereas*, when Thomas E. Skinner contracted to buy the lot, and to build thereon, it was agreed between him and his wife, that she should furnish the funds to pay for the same out of her separate estate, secured by a marriage settlement dated 8th May, 1854, and that the lot should be secured to her separate use, which was never done, but the deed was by over sight made to him. *And whereas*, the furniture was purchased with her money, and as her sole property.

*And whereas*, his father, Charles W. Skinner, had assigned to Womble, as trustee for the said wife, certain notes made by him (Thomas E. Skinner) as principal, and by Charles W. Skinner, jr., as his surety of large amount, and certain other notes to which Charles W. Skinner, jr., was principal, and Thomas E. Skinner, surety, and the said wife had agreed to surrender said bonds to said Thomas E. Skinner, and to re-lease him from the same.

*Therefore*, he (Thomas E. Skinner) conveys to Womble the said lot and furniture, in trust for the sole and separate use of his said wife Anne, &c.

The plaintiff contends that so much of the consideration

recited as consists of the surrender of the notes of Thomas E. Skinner is fraudulent and part of the conspiracy between the parties to defraud the creditors of Charles W. Skinner.

It is clear and is conceded that the assignment of the notes of Thomas E. Skinner to Womble by Charles W. Skinner, who was insolvent at tne time, was voluntary, and was therefore fraudulent and void as to *his* creditors. Neither Womble or Mrs. Skinner owned or could lawfully release or surrender the notes. The surrender which was actually made was void, and the parties to the notes, (notwithstanding they have probably been destroyed,) are still liable to the personal representative of Charles W. Skinner for the benefit of his creditors. To that extent the consideration for the deed failed. But the agreement to surrender the notes was not a fraud upon any party to the deed *nor upon the creditors of Thomas E. Skinner, which character alone the plaintiff claims in this action.* It is clearly distinct and separate from the other consideration recited, viz: the equity of Mrs. Skinner, and did not necessarily infest and vitiate the whole deed. It neither supported or impaired the deed. If Mrs. Skinner had an equity by virtue of which a Court would have enforced the execution of a settlement of the property to her separate use, she did not lose that equity, because in the deed by which her husband undertook to do what a Court of equity would have compelled him to do, he recited a false consideration in addition to the true one. With that recital she had nothing to do. If, on the contrary, Mrs. Skinner had no equity for a settlement which a Court would have enforced, then it is admitted that the deed to Womble was voluntary, and therefore fraudulent and void as to the creditors of her husband.

It is thus seen that the deed to Womble may be put out of the way as not affecting the *real* merits of the controversy.

The main question is, did Mrs. Skinner have an equity to have this property settled on her?

That question we proceed to consider. The material facts concerning it are fully reported by the referee, whose report

we take occasion to say is creditable to his ability and industry. In brief they are these :

On 8th of May, 1854, Thomas E. Skinner being about to marry Anne S. Ludlow, then a resident of New York, the two entered into a written contract, by which (in substance and as accurately as there is any occasion here to state it,) he agreed that her property should continue hers, notwithstanding the marriage, and that she should have power to control and dispose thereof as if she were a *feme sole*. The property consisted exclusively of bonds and mortgages, which were in the possession of her guardian, who was her father and resided in New York.

The marriage took place in New York on the day of the execution of the contract. The contract was duly recorded there. It gave to the wife substantially or precisely the rights in and over her property which she would have had by the laws of New York if no express contract had been made. It was never registered in North Carolina, but contained no provision unlawful in that State, or contrary to its policy.

The domicil of origin of Thomas E. Skinner was North Carolina, and that domicil remained unchanged at the marriage. There is no evidence that the parties contemplated or contracted in reference to any particular domicil or place of residence after marriage. The husband had just become a licensed ministsr, and was probably open to any acceptable call from any quarter. He and his wife did in fact go to Petersburg and remained there for a year before coming to North Carolina. It must be held, however, that upon the marriage, the domicil of the wife by construction of law, became that of the husband, viz : North Carolina. *Smith* v. *Morehead*, 6 Jones Eq., 360; Story Confl. of Laws, sec. 195 ; *Ford* v. *Ford*, 14 Mart. La. R. 574.

In 1855 the husband and wife took up their residence in Raleigh, North Carolina. In 1856 she executed to him a power of attorney to collect all debts due to her, and under this he did receive at various times up to 4th December, 1860,

sums amounting in all to $45,469.62. The first time the hus-
band received any of the wife's money was on 8th May, 1857.

We pause here again in the statement of the facts, for the
purpose of determining what was the effect of the ante nuptial
contract of May, 1854, upon the property of the intended wife.

It is admitted that it was valid in New York to all intents
and purposes. By force of it, as well as of the general law of
that State, the estate of the wife in her choses in action re-
mained just what it was before her marriage. The husband
was not even a trustee for his wife. He acquired no estate
legal or equitable. He was not authorized to receive payment
of her choses in action except by her consent, and as her agent.

It is also admitted that it was binding on the parties every-
where. Story Confl. Laws, sec. 184, 1, sec. 241. *Trimbey* v.
*Vignier*, 1 Bing., N. C. Rep., 151.

It must also be admitted, and we suppose it to be, that but
for the act of 1785, (Rev. Stat., chap. 37, sec. 29,) the contract
in question would have had the same force and effect in North
Carolina, after the removal of the parties and of the property
here, which it had in New York.

We conceive that it must also be admitted that if the wife
had personally, or by any agent, brought her money to this
State, and purchased land with it, taking a deed to her separate
use, such deed would have been valid.

The learned counsel for the plaintiff contends however:

1. That the matrimonial domicil of Thomas E. Skinner and
of his wife was North Carolina.

2. That the ante-nuptial contract is presumed to have been
made in reference to the laws of this State, and to have been
intended to be, and was governed by the laws of this State in
reference to its construction, and also as to the formalities of
its proof and registration; and

3. That as it was not registered in North Carolina, by the
act of 1785, it was void as to the creditors of Thomas E. Skin-
ner, and that the property of the wife was brought into this
State and put (it must be with or without her consent) in a

tangible shape so as to be susceptible of levy under execution, it became liable to such levy for the debts of her husband.

We have already said that upon the marriage the domicile of the husband became *by construction of law*, that of the wife.

The rule of law is, that the *construction* of a contract is in general to be governed by the law of the place where it is made. *Story Confl. Laws, s.* 278 and 278, *a.*  But if it appears clearly to have been intended to be performed elsewhere, then the construction is to be governed by the law of the place where it is *intended* to be performed.  *Le Beton* v. *Miles & Paige* 261;  *Le Beton* v. *Nourchet,* 3 Marl. La., 60.  But this means nothing more than that where it can be gathered from the terms of the contract, or from the circumstances attending it, that the parties intending it to be governed by the law of some certain place other than that of its making, the law of such place as to its construction, becomes a part of the contract as if it had been inserted in it.  It is only a question of intent, and not one of positive law.

I am not aware of any case that holds that where the domicile of the husband becomes *merely by construction of law* that of the wife, and there is no other evidence that the law of his domicile was looked to as the place where the contract was to be performed, such domicile governs the construction of the contract.

The question however here is not one of construction, but of registration ; and not only am I not aware of any authority that the law of the constructive matrimonial domicile governs in that respect, but I think there is some authority, and conclusive reason, to the contrary, and that as to such matters, the *lex loci contractus* governs.  Story Confl. Laws, s. 242; (1) 242 *a.* *Trimbey* v. *Vignier,* 1 Bing. N. C., 151;  *Waunder* v. *Waunder,* 9 Bligh. R. III;  *Story Confl. Laws,* s. 276, 276*a* ; 372, 372*a.*

In *s.* 282, Story says: In general it may be said that if no place of performance is stated, or the contract may indifferently

35

be performed any where, it ought to be referred to the *lex loci contractus. Don* v. *Lipman,* 5 Clarke & Fin. R. 1.

In *Wilder,* succession of 22 La., An. 219, the husband was domiciled in Louisiana and the wife in Mississippi where the marriage took place. Immediately after the marriage they removed to Louisiana, and resided there until the husband's death. The Court say that *the form* of the contract was to be governed by the *lex loci actus,* but its effect by that of Louisiana.

In *Wharton,* Confl. Laws, s. 419, it is said "Where by local legislation certain forms are necessary to the validity of certain contracts (2, 9, registry, enrollment, acknowledgement before a magistrate or notary,) there the place where those forms are complied with, is to be regarded as the place of contract." He cites Lavigny VIII., 371. In sect. 429 he says, where there are several possible local laws, that is to be applied which is most favorable to the contract. In sec. 676 he says, that all modern jurists concur, that it is sufficient if a contract be authenticated according to the law of the place where it is made.

In the *United States Bank* v. *Lee,* 13 Peters, the Supreme Court of the United States expresses the opinion that a statute of Maryland similar in its supposed effect to ours of 1785, was not intended to operate on contracts made out of the State. See also *Adams* v. *Hayes,* 2 Ire., 361.

Now as to the reason of the proposition. Where there is a place clearly fixed by the contract in which it is to be performed, it may not be unreasonable to suppose that the parties intended to authenticate it according to the law of that place, and if they have omitted to do so, it may be because they have abandoned the contract. But where no such place is fixed in any way, and the contract is one which by its nature must be performed wherever the parties may at any time be, no such presumption of intent can be made. To hold that the law of the constructive domicile after marriage governs the authentication and publication of an ante-nuptial contract, as by registration, would in most cases be a fraud upon the wife. She is

presumed to know the law of the State of her domicile at the time she contracts, but she cannot be presumed to know the law of another State, because it is the domicile of her intended husband. The marriage may not take place for months after the execution of the contract, and in the meanwhile the actual domicil of the husband may change without her consent, or even knowledge, and she cannot be justly be held to contract with an intent to subject the contract to the law of a place which she may not know.

We conclude that the contract did not require registration in North Carolina, to make it valid here, but was governed in that respect by the law of New York where the domicile of the wife was when it was made.

This point being established, it is an adjudged question, that the removal of the property by the parties to North Carolina in 1855, did not invalidate the wife's right.

The question was decided in *United States Bank* v., *Lee*, 13 Peters 107. In 1809 Richard Bland Lee and his wife Elizabeth resided in Virginia. He was then largely indebted to Judge Washington, and he and she joined in a deed whereby she relinquished her right of dower in certain lands belonging to him, and also conveyed lands belonging to her to trustees to secure that debt, which was afterwards paid by a sale of her land. In consideration of her execution of that deed, the husband conveyed to trustees certain slaves for her separate use, and this deed was duly recorded in Virginia. In 1814 Lee and his wife removed to the District of Columbia, taking with them the slaves, which remained in his apparent possession with the acquiescence of his wife, and he obtained credit upon their supposed ownership, Some of them he sold to supply the wants of his family, with her like silent acquiescence. In 1817 he borrowed $6,000 from the U. S. Bank, and gave a deed in trust on the slaves to secure it. He died insolvent in 1827, and in 1834, the Bank filed a bill against Mrs. Lee and her trustees to compel a surrender and sale of the slaves to pay the debt to it. It was contended,

that although the deed of 1809 was valid in Virginia, yet when the parties removed with the property to the District of Columbia, the property became liable to the creditors of the husband in the District, because of a law of Maryland in force in the city of Washington,) where the parties and the slaves lived,) which declared that no goods, &c., whereof the vendor shall remain in possession shall pass, or any property therein be transferred to a purchaser, &c., unless the sale be by writing proved and recorded in the county where the seller resides within twenty days after the making thereof. (Act of Maryland 1729, chap. 8, sec. 5.)

CATRON, J., delivering the opinion of the Court, says : " The statute has no reference to a case where the title has been vested by the laws of another State, but operates only on sales, mortgages and gifts made in Maryland. The writing is to be recorded in the same county where the seller shall reside when it is executed. The seller, R. B. Lee, residing in Virginia, it was impossible for Mrs. Lee to comply with this act. That the Virginia deed secured to Mrs. Lee the same rights here that it did in Virginia we apprehend to be, to some extent, an adjudged question." He then cites *Smith* v. *Burch*, 3 Har. & Johns. (Md.), and *Crenshaw* v. *Anthony*, Martin & Yer. (Ten.) 110.

The plaintiff's bill was dismissed.

In *DeLane* v. *Moore*, 14 Howard S. C. 253, decided in 1852, the facts in substance were, that Mrs. DeLane, a widow residing in South Carolina, in contemplation of marriage with John Yancey, entered into an ante-nuptial contract, whereby certain slaves were agreed to be settled to her separate use. There was no conveyance to a trustee. The marriage took place and the deed, or a copy of it, was recorded in South Carolina, but not, it seems, in exact compliance with the laws of that State. Afterwards the parties removed to Alabama, where after the death of the wife the husband sold the slaves to one Gover. The bill was brought by the representative of the wife against the administrator of Gover to recover the

slaves. The Court (by DANIEL, J.,) say: "It has been made a ground of defence in the answers in the Court below, and it has also been insisted on in the argument here, that admitting the ante-nuptial contract to have been recorded in the State of South Carolina, and in consequence thereof to have been so operative as to affect with notice creditors and purchasers within that State, yet that upon the removal of the parties carrying with them the property into another State or jurisdiction, the influence of the contract for the protection of the property would be wholly destroyed and the subject attempted to be secured would be open to claims by creditors or purchasers subsequently coming into existence. The position here advanced is not now assumed for the first time in argument in this Court. It has upon a former occasion been pressed upon its attention and has been looked into with care, and unless it be the intention of the Court to retrace the course heretofore adopted, this may now be, as it formerly was called, an adjudged question." He then cites with approval the case of *U. S. Bank* v. *Lee.* In *Adams* v. *Hayes*, 2 Ired. 361, it is admitted that a parol gift of slaves made in South Carolina, good at common law which prevails in that State as to such gift, would be good after the property is brought here, notwithstanding our law requiring such gifts to be in writing and registered, and it does not seem to have been thought that it would make any difference whether at the time of the gift the property was intended to be brought here or not. In our opinion it is not a matter of any importance whether the contract was technically executed or executory, so far as it concerns the question now before us. In equity, what is agreed to be done is considered as done, whenever such a conclusion is necessary to support the rights of the parties under it.

No doubt nice distinctions may be drawn between those cases and the present, but none we think that are essential. The principle at the bottom of them all is, that by the contract the property remained in or passed to the wife in the State where it was made; that it was *her* property, and her estate

did not change its character on being carried with the parties into another State, although by the laws of the latter State, registration is required of such instruments executed there or taking effect upon property situated there.

There remains the enquiry which is mainly one of fact, did Thomas E. Skinner receive the money of his wife and bring it into this State as her agent, upon an agreement to invest it in her name, and did he purchase and improve the lot in question with it, and in violation of his agreement, take the title to himself? There can be no question that the husband received a very large sum as the agent of his wife, and the referee finds that he received it upon an understanding that he would return it or invest it in her name, and especially that he would invest a part of it in buying and improving the lot in question. The whole lot was conveyed by Cook to Lewis, Williams, Jones and Thomas E. Skinner on 1st April, 1856. The part of it now in question was conveyed to Thomas E. Skinner by his co-tenants on 17th September, 1859. The referee finds that it does not appear by whom the consideration of the deed of 1856 was paid, but that it was not paid with the money of Mrs. Skinner. This is immaterial.

He also finds that it does not appear by whose means the consideration of $6,000 recited in the deed of 1859 was paid.

The deed to Womble recites that the consideration of the deed of 1859 was paid by Thomas E. Skinner from his wife's estate. This recital would support an equity in his wife against him, to have the title conveyed to or for her; but is admittedly no evidence against his creditors. We think, however, that although the referee does not directly find this fact, he does find other facts from which this must necessarily be inferred.

A principal who undertakes to follow his money into property, into which it has been fraudulently converted by his agent, is not required to show that the identical bills of exchange or bank notes which he gave to the agent with directions to pay for certain property, were paid for that property. If this were

so, the agent need only convert the bills of exchange into bank notes, or the bank notes into others, in order to make his fraud successful. Fraud cannot so easily evade pursuit. The principal need only show that he gave money to the agent upon a promise to invest it in the purchase of certain property, and that the agent did afterwards purchase that property and take the property to himself. Upon this proof there is a clear equity to follow the property and have it conveyed as it ought to have been.

That is just the case here. The referee finds that between —— and —— the husband received large sums as agent of the wife; that he agreed to invest a part of that money in this lot in her name; that in 1859 he did purchase the lot, and at first directed Mr. Lewis to make the deed to his wife, as the payment was to be from her means; that he afterwards told Lewis to draw the deed to him, as it would injure his credit if made to his wife; and that it was accordingly so drawn. Can a Court of equity doubt, upon these facts, that the land was paid for with the principal's money? If it will refuse to allow a principal to follow his money under these circumstances, upon what proof can he do so?

We think that we are bound to draw the conclusion from these facts, and without reference to the recital in the deed from the husband to Womble that in contemplation of law, Mrs. Skinner's money went to pay for the lot.

The referee directly finds that her money, to the sum exceeding $10,000, paid for the buildings, &c.

If it were not clear that Mrs. Skinner's money paid for the lot, as well as for the buildings *and furniture*, there might be a question of the apportionment of the fund. But in the view we take of the case, no such question arises.

On these facts, the equity of Mrs. Skinner against her husband and his creditors is indisputable. It rests on a valuable consideration, is *bona fide*, and there is nothing in the circumstances attending it, to make it fraudulent as to her husband's creditors.

As to any conclusions of fraud to be drawn from her silent acquiesence in the dealings of her husband so far as they were known to her; as for example, his sale of a part of the lot to Dr. Johnson ; that is disposed of by the observations of CATRON, J., in the *U. S. Bank* v. *Lee*, p. 119.   The learned Judge says in substance :  " If a party having title to property stands by, and sees another deal with it as his own, and does not make his title known under circumstances which require him to do so, that is a fraud which estops him from setting up his title afterwards.   How far that principle would apply to a wife standing by, and seeing her husband deal with her property, the Court does not decide.   But Mrs. Lee was only passive and silent, although she may have known that Lee was obtaining credit on the strength of her property.   A Court of Chancery will not hold her responsible because of her silence."

In the present case it does not appear when Mrs. Skinner first knew that her husband had taken a deed for the lot in his own name.

We are of opinion that the plaintiff purchased subject to the equity of Mrs. Skinner, and that her equity is paramount to the claim of the creditors of her husband.

PER CURIAM.   A decree may be drawn in conformity with this opinion.

BYNUM, J., *Dissenting.*   I am compelled to dissent from the opinion of the majority of the Court.

1. It is not denied that if Anne S. Ludlow domiciled in New York, had come to North Carolina, entered into this marriage contract, and married Thomas E. Skinner, domiciled in this State, the contract, to be good against his creditors, must have been registered in North Carolina, in comformity to our law.   Rev. Stat., chap. 37, sec. 29.

It is not denied that in such case, the deed in trust, for her benefit, to Jordan Womble, by the insolvent husband, would

have been void as to creditors, as a voluntary deed, made without consideration.

It is not denied that if the ante-nuptial contract, though executed in New York between Anne Ludlow, domiciled there, and Thos. E. Skinner, domiciled in North Carolina, had been entered into with the intent to be performed in North Carolina, the law of this State would govern its validity, and it would be void for want of registration.

The question then is narrowed down to a single point, viz: with what *intent* was the marriage contract entered into by the parties? and the question is reduced to still narrower limits by the admission of the other side, that here no *express* intent appears one way or the other. So we have this question, does the law, in such cases, *imply* an intent in the parties as to the place of performance, and if so, by what rule is that intent to be ascertained and declared.

No one disputes the general proposition that, in the absence of any contrary intent, express or implied, the *lex loei contractus*, governs the validity and construction of the contract, and therefore, if Skinner had gone to New York and entered into a contract, not a marriage contract, that the law of New York would govern it, nothing else appearing.

But no principal of international law is better settled, than that marriage contracts, constitute a well known exception to the law of contracts and rest upon principles peculiar to that relation.

In regard to such, the rule is, " That the wife's rights, capacities and disabilities, under the contract of marriage, are determined by the law of the husband's domicile when the marriage took place." Burge, Vol. 1, 244-260, and Kent, Vol. 2, 594, note 6, cites this passage with approbation, and thus continues: " This is the law in this country if the parties had not in view, at the time, another place of residence. If the husband and wife have different domicils at the time of marriage, the law of the husband's domicile governs the marital rights; and if neither party have any determinate domicile at the time,

the *lex loci contractus* governs," and *Knewland* v. *Ensley*, Meigs 620, and *Whitcomb* v. *Whitcomb*,. 2 Curters, 351, are cited.

If the parties agree previously to their marriage upon a place of residence after it, and actually settle there, it becomes the place of their matrimonial domicile, and the marital rights of the husband to the wife's property are determined by the law that of domicile.   Meigs 620, *Le Breton* v. *Miles*, 8 Paige, 261, 26 Miss. 548.

No authority has been cited, in the opinion of the Court, or, we believe, can be found, conflicting with the propositions thus established.

1. That the husband's domicile is that of the wife.   2. That his domicile governs the law of the contract.   3. That this is always so, unless the parties, at the time agree otherwise, which is not pretended in our case.

If more authority is required, Story in his Conflict of Laws, 164-167, after a thorough review of all the jurists, announces the same doctrine to be : " That where the domicile of the husband and that of the wife are not the same, the law of the husband's domicile is to prevail, unless he means to establish himself in that of his wife," and the very section, Story 195, cited by Justice RODMAN, affirms the opposite doctrine, to the one he contends for, and establishes the rule I contend to be the true one.   That author adopts the language of the Supreme Court of Louisiana, in *Ford* v. *Ford*, 14 Martin, 574, 578, to wit : " We think that it may be safely laid down as a principle, that the matrimonial rights of a wife who marries with the in-tention of an instant removal to another State for residence, are to be regulated by the laws of her intended domicile, when no marriage contract is made, *or one without any provisions in this respect*," and in the same case the Court also recognized the general rule that when the husband and wife have different domicils, the law of that of the husband is to prevail, because the wife is *presumed* to follow her husband's domicile.   And Justice STORY concludes the whole subject, in this emphatic

language: "Under these circumstances, where there is such a general consent of foreign jurists, to the doctrine thus recognized in America, it is not, perhaps, too much to affirm, that a contrary doctrine will scarcely hereafter be established." Sec. 198.

Not a single case cited in the opinion of the Court, which I have been able to examine, sustains that opinion, or has any application, unless to confirm my position. In *U. S. Bank* v. *Lee*, Pet. 107, the husband and wife, residing in Virginia, the husband, to secure a debt which he owed to the wife, conveyed certain slaves to secure the debt. Both removed to Maryland where the husband conveyed the slaves in trust and died. The law of Maryland required the deed of the husband to be registered there. The wife recovered the slaves, and why? Because the contract with her husband was made in Virginia, where *both were domiciled*, and according to the law of that State. In *DeLane* v. *Moore*, 14 How., 253, Mrs. DeLane contemplating marriage with John Yancey entered into a marriage contract, in South Carolina, which was there recorded. They removed to Alabama where the wife died and the husband sold the property. The representatives of the wife recovered, and why? Because both parties were domiciled in South Carolina when the marriage contract was made and it was made and recorded according to the laws of that State, and was therefore valid every where. So in *Adams* v. *Hayes*, 2 Ired. 361, it was held that a parol gift of a slave, made in South Carolina, would be held valid here, although our laws required a registration of the deed of gift. Why? Because the gift was made in South Carolina, in reference to, and according to the laws of that State, and the donee resided there. In *Smith* v. *Morehead*, 6 Jones Eq., 360, not cited in the opinion, this Court said, " the only remaining inquiry is, what effect the marriage had upon the domicile of the parties. Upon this question we think the law is well settled; in the case of *Waunder* v. *Waunder*, 9 Bligh. 89, the House of Lords laid down in the strongest terms that the domicile of the husband

drew to it the domicile of the wife." In that case it was held that the domicile of the wife was Guilford, where the husband resided and not in Wake where she then and always had resided.

In our case, the referee found that North Carolina was the domicile of Thomas E. Skinner, at the time of the contract and marriage. A domicile once acquired, remains until a new one is acquired, *facto et animo.* Story Confl. Laws, s. 47.

The conclusion then, to my mind, is irresistible that the marriage contract, not having been registered, according to the laws of this State, was void as to creditors, and therefore there was no consideration, legal or equitable, to support the deed to Jordan Womble, for the benefit of his wife, and that the deed for the house and lot in controversy, was fraudulent and void, as to the creditors of Thomas E. Skinner.

II. But, assuming that the marriage contract was valid in North Carolina, and that the debt due to the wife, was sufficient consideration for the deed to Womble, in my opinion the deed was executed for the purpose of hindering, delaying and defrauding the creditors of Thomas E. Skinner.

It is found by the referee, that the deed was executed by Skinner, with the intent to hinder, delay and defraud his creditors, so we are relieved of all inquiry as to his purpose, and will confine the enquiry as to the fraudulent intent of Mrs. Skinner, the only other party to the deed beneficially interested. The referee does not, in so many words, find that she was a party to this fraudulent purpose, but such is his finding, in substance and effect.

In this aspect of the case, the facts found by the referee, are that Thomas E. Skinner, on the 30th October, 1865, was indebted, by bond, to his father Charles W. Skinner, who was insolvent, and his whole estate then consisted in these bonds. On that day, Charles W. Skinner, the father, by deed and endorsement, assigned these bonds to Womble, in trust for the use and benefit of Anne, the wife of Thomas E. Skinner, with power to her to collect and dispose of, by a writing signed by

her and witnessed. That this assignment was without valuable consideration, and that on the same day Anne, the wife, by deed directed the bonds to be delivered to Womble, and therein stating that he had fully satisfied her for them, and on the same 30th October, Thomas E. Skinner conveyed the house and lot to Womble, in trust for his wife, reciting, as the consideration of the deed, the ante-nuptial contract, and these bonds, amounting to $15,560.

The referee further finds, that at the state of the execution of the deed, Anne S. had reason to know that Charles W. Skinner was insolvent, and that these bonds were his entire estate, and that she also knew her husband was insolvent. So, Mrs. Skinner, when she received these bonds from Charles W. Skinner and transferred them to Womble and acknowledged payment for them, as part consideration of the deed, knew of the insolvency of Charles W. Skinner, and that the assignment of the bonds to her, being without consideration, was a fraud upon his creditors, and also upon the creditors of Thomas E. Skinner. If then this transaction on the part of Thomas E. was with intent to defraud his creditors, as the referee has found, and as is admitted, why it is not fraudulent on the part of Mrs. Skinner, who, with a full knowledge, received the corrupt consideration and passed it to her husband as an inducement and consideration for the conveyance of this property to her, is inconceivable to me. She was a party to the whole transaction, between Thomas E. and Womble, and acted with full knowledge of all the facts. Both, the husband and wife, having equal knowledge and the same motive, and participating in the same illegal acts, it is impossible to say his intent was fraudulent and hers was not. In *Lassiter* v. *Davis*, 64 N. C., 498, the Court say, " there were badges of fraud upon the face of the deed between the parties, and of course, whatever was thus apparent, both parties were cognizant of and participated in." So here, the husband and wife, were cognizant of and participated in the whole transaction, and must be held to the measure of criminality.

It is admitted that the bonds which entered into the consid eration of the deed was a fraudulent consideration, but it is insisted that the deed is supported by the other part of the consideration, to wit, the debt due, under the ante-nuptial contract.

The principle which governs this part of the case is this: If A makes a conveyance to B in trust to pay C a *bona fide* debt and to pay D a fraudulent one, the fraudulent considera- tion to the one shall not defeat the deed as to the good debt to the other, because the good is separable from the bad. See *Hefner* v. *Irwin,* 1 Ired. 490, and that class of cases. But where the considerations move from the same person, who is to get the entire benefit of the deed, a part of which is good and part fraudulent, then the whole deed is vitiated and void, because the corrupt consideration moves from the person who claims the entire benefit. It would be monstrous morals if a Court of Equity, whose highest functions is to denounce fraud, should hesitate to declare void a deed whose entirety is based on a contrived and premeditated fraud of both parties to it. It is no part of the duty of this Court to wash the dirty linen of suitors, or to act the part of casuists by going into the mind of the individual and separating the pure from the im¦ pure part, if it can be done, and then bestowing upon it the rewards of virtue. It would be as reasonable for the Court to refuse to punish the murderer because he is a man of truth. How is this Court, or any tribunal or person, to know which consideration, the good or the bad, was the moving cause to the deed, and how can this Court separate them when they both moved, not from different, but the same heart? The law denounces the whole transaction as a fraud. *Brannock* v. *Brannock,* 10 Ired. 428; *Stone* v. *Marshall,* 7 Jones 300; *Shober* v. *Hauser,* 4 D. & B. 91; *McNeil* v. *Riddle,* 66 N. C. 290.

III. The wife here permitted the husband to use and treat her money as his own, and having thus by her connivance aided him in obtaining a false credit, she will not now be

heard to say the property was hers, to the detriment of honest creditors.

Upon this part of the case the referee has found the following facts: "That the defendant, Anne S. Skinner, permitted her husband to receive from New York, in money, the proceeds of the choses in action, which were hers before marriage. That he used the money so received freely and without question by her, and with her assent; that she . confided and committed her funds to the control and management of her said husband, upon the general understanding that he was "to return or re-invest" for her, but the understanding was not in writing and there was no clear, definite or specific contract in regard to it, or of the manner in which it was to be done. That the defendant, Thos. E. Skinner, used this fund as his own ; that from 1855 to 1861, he invested a portion of it in his own name, and none in the name of his wife ; that the general understanding that he was to return or re-invest it for his wife was never executed ; that he spent a portion ; that during the period mentioned above and down to the time, the defendant, Thos. E. Skinner was known to be insolvent, no attention was given to the matter by Anne S. Skinner, no notice was taken by her of the same, and no complaint made on account thereof."

When it is considered that this entire fund consisted of money, the most fleeting and unsubstantial of all property and incapable of identification ; that it was received by him from time to time through a period of many years, and used by him for every purpose of life, whether of pleasure or profit, and that, too, without question or complaint on her part, to my mind it is difficult to conceive a more complete gift and dedication to his use than is furnished by the simple narrative of the referee above set forth.

To hold that the wife can follow the money and fasten an equity upon the thousand from which it may have been invested in the travels of the husband in Europe and America is absurd and shocking to every idea of free dealing in the

commodity of money. Yet that is the proposition and that is the equity of Mrs. Skinner in this case. Having allowed her husband to sail under false colors and to incur debts upon the credit of property to which he had the legal title, she should be estopped now from asserting a claim to the prejudice of *bona fide* creditors.