WEATHERS & CROWDER v. M. D. and J. S. BORDERS.

(Decided May 5, 1899).

*Petition to Rehear—Practice—Errors Assigned—Facts—*
*Law—Statutory Lien—Married Women—The Code,*
*Section 1826.*

1. A petition to rehear should contain a plain, concise statement of facts, or law overlooked or erroneously decided, and not a mere argument.

2. No case should be reheard upon petition, unless it was hastily decided and some material point was overlooked, or some direct authority was not called to the attention of the Court.

3. There can be no statutory lien without a debt for the lien to rest upon.

4. The Code, Section 1826, confines the capability of a married woman, unless a free trader, in making contracts, affecting her real and personal property to the instances therein mentioned, unless with the written consent of her husband.

5 The building of a house on a lot belonging to a wife does not fall within any of the exceptions embraced in Section 1826—nor would a judgment against her on a debt embraced within those exceptions constitute a lien on her real estate, although her personal estate would be liable.

6. Although coverture may not be pleaded, if it appears in the case, it is the duty of the Court to see that a *feme covert* has the benefit of this defence.

PETITION TO REHEAR.   Case reported in 121 N. C., 389.

*Messrs. Webb & Webb,* for petitioners.
No counsel contra.

FURCHES, J., delivers the opinion.
CLARK, J., delivers dissenting opinion.
DOUGLAS, J., delivers concurring opinion.

WEATHERS *v.* BORDERS.

FURCHES, J. This case was heard at Fall Term, 1897, and is reported in 121 N. C., 389.

It has been held that a petition to rehear a case, which had been decided by this Court, should contain a plain, concise statement of the facts or law overlooked, or erroneously decided; but that it should not undertake to establish such alleged errors by a course of reasoning. *White v. Jones,* 92 N. C., 388.

This petition is an argument containing ten pages of printed matter with citation of authorities to sustain the argument, and was used as a brief by the petitioner in his argument. This rule may not always have been observed by attorneys in preparing their petitions to rehear. But still, we understand that this is the rule established by this Court, and that it should be observed in preparing such petitions.

This Court has repeatedly held that "no case should be reheard upon a petition to rehear unless it was decided hastily and some material point was overlooked, or some direct authority was not called to the attention of the Court." *Watson v. Dodd,* 72 N. C., 240; *Hicks v. Skinner,* 71 N. C., 539; *Haywood v. Daves,* 81 N. C., 8; *Devereux v. Devereux, Ibid.,* 12; *Smith v. Lyon,* 82 N. C., 2; *Lockhart v. Bell,* 90 N. C., 499; *University v. Harrison,* 93 N. C., 84; *Dupree v. Insurance Co., Ibid.,* 237. "Where the grounds of error assigned in the petition are substantially the same as those argued and passed upon in the former hearing, the Court will not disturb its judgment." *Lewis v. Rountree,* 81 N. C.. 20.

It is alleged in this petition that *Smaw v. Cohen,* 95 N. C., and *Farthing v. Shields,* 106 N. C., 289, were probably overlooked by the "Chief Justice" in writing the opinion of the Court. We have examined these cases, and in our opinion neither of them sustains the contention of the petitioner, but are authority against him. *Smaw v. Cohen, supra,* is

authority for holding that where the *debt* sued for is less than
$200, the action should be brought before a Justice of the
Peace; and that where the *debt* is established by the judg-
ment, the *statute* creates the lien.   But where the debt is less
than $200, and it is sought to establish an equitable lien, the
action *must be brought in the Superior Court,* as a Justice of
the Peace has no equitable jurisdiction—citing *Dougherty v.
Sprinkle,* 88 N. C., 300.

This action was commenced before a Justice of the Peace,
the amount claimed being less than $200.   And to this extent
*Smaw v. Cohen, supra,* sustains the jurisdiction of that Court,
if it is an action of *debt,* and where the statute is relied on to
fix the lien.   But if plaintiffs' action could be sustained, as
an equitable lien on the house, as it is argued in the petition
that it can be, then the action should have been brought in
the Superior Court, as a Justice of the Peace has no equitable
jurisdiction.   So we see that according to *Smaw v. Cohen,* in
order to give a Justice of the Peace jurisdiction it must be
*an action of debt.*   If it is an action to establish an *equitable
lien,* a Justice of the Peace has no jurisdiction, and the plain-
tiff is out of Court.

The case of *Farthing v. Shields, supra,* is also authority
against the petitioner, as we will show further on.   If the
petitioner had grounds for an equitable lien, as he claims, he
should have commenced his action in a Court that had equita-
ble jurisdiction.   He could not succeed in this action, as
the Superior Court has no greater jurisdiction than the Jus-
tice of the Peace had, from whom the appeal was taken.   So
the petitioner must rely on the statute, Code, Section 1826.
This Section   provides:   "No married woman   during her
coverture shall be capable of making any contract to affect
her real or personal   estate, except   her necessary   personal
expenses, or for the support of the family, or such as may be

necessary in order to pay her debts existing before marriage, without the written consent of her husband, unless she be a free trader, as hereinafter allowed."

The *feme* defendant was the owner of a lot of land in the town of ——————, and she and her husband contracted *verbally* with the plaintiffs to build a house on this lot belonging to the wife. The plaintiffs built the house, and they admit that they have been paid for the same, except $37. The plaintiff brought his action before a Justice of the Peace against the husband and wife for the balance due him for building the house, and in this action he claims a mechanic's lien on the house for his debt. He recovered judgment against the husband but the Court refused to give judgment against the *feme* defendant, and also refused to declare a lien on the house in favor of the plaintiff. This judgment of the Superior Court was affirmed by this Court, when it was here before, (121 N. C., 389). The petitioner says that this was error, which he asks to have corrected.

To entitle a party to a statutory lien (as this must be, if a lien) there must be a valid indebtedness. The debt is the cause of action, and the lien is only incident to the debt. There can be no statutory lien without a debt for the lien to rest upon. *Wilkey v. Bray,* 71 N. C., 206; *Baker v. Robinson,* 119 N. C., 289; *Clark v. Edwards, Ibid,* 115.

It therefore follows that plaintiff can have no lien on the house and lot, unless he has a *debt* against the *feme* defendant, upon which he could recover a personal judgment against her.

This brings us to a consideration of Section 1826, of The Code, quoted above. And we find that this Section fails to give the petitioner any right to recover judgment against the *feme* defendant. The statute declares that no married woman shall be *capable* of making any contract affecting

either her personal or real estate, *except for her necessary
personal expenses or for the support of the family,* or such as
may be necessary to pay her debt, unless with the *written*
consent of her husband, existing at the time of her marriage,
unless she be a free trader.   It is admitted that she is not
a free trader; and it is perfectly apparent to us that the build-
ing of a house on a lot belonging to the *feme* defendant does
not fall under any one of the exceptions contained in Sec-
tion 1826.   It is not her *necessary personal expenses;* it is
not what could be termed *expenses incurred for the support*
of the family, and it is not claimed that it is for a debt due
at the time of her marriage.   With this interpretation of
Section 1826, which seems to us to be so manifestly correct
that we hardly see how it could be understood otherwise, we
fail to see the error in the former opinion and judgment of
th's Court, which the petitioner seeks to point out.

But if the plaintiff had been able to establish a debt and to
have obtained a judgment against the *feme* defendant for any
of the excepted matters in Section 1826, for which she may
contract, such judgment would not have been a lien on the
*real estate* (the house and lot) of the *feme* defendant,
although her personal estate would be liable for the payment
of such judgment.   This doctrine has been announced by this
Court in a great number of cases, some of which we cite as
follows:   *Loan Association v. Black,* 119 N. C., 323, in
which case the following cases are cited to sustain this posi-
tion; *Thurber v. La Roque,* 105 N. C., 301; *Farthing v.
Shields,* 106 N. C., 289; *Hughes v. Hodges,* 102 N. C., 236;
*Lambeth v. Kennery,* 74 N. C., 348; *Littlejohn v. Edgerton,*
76 N. C., 468.   We therefore see no grounds upon which
plaintiffs' claims could be declared a lien on the house and
lot, the "real estate of the *feme* defendant," even if he could
get a judgment against her.

It is contended in the petition to rehear (used as a brief)

WEATHERS *v.* BORDERS.

that the *feme* defendant did not plead her coverture.    But it appeared all through the case that she was a *feme* covert, and, this appearing, it was the duty of the Court to see that she had the benefit of this defence.    *Moore v. Wolfe,* 122 N. C., 711, and authorities there cited.    Petition dismissed.

CLARK, J., dissenting.    The Constitution, Article X, Section 6, guaranteed the property rights of married women.    It provides, "The real and personal property of any female in this State acquired before marriage, and all property, real and personal, to which she may, after marriage, become in any manner entitled, shall be and *remain* the sole and separate estate and property of such female, and shall not be liable for any debts, obligations and engagements of her husband, and may be devised and bequeathed, and, with the written assent of her husband, conveyed by her as if she were unmarried."    This made her as  absolute  owner  of  her property, as she was before marriage, or as her husband was of his, with the single exception that in conveyances of her property, she must have the written assent of her husband, and there is no distinction in that or any other respect between her rights over real or personal property.

The Code, Section 1826, in restricting her rights to make contracts affecting her property, without the written assent of the husband—except in three cases named, is in direct conflict with this provision of the Constitution, and is a curious instance of the survival of preconceived opinions, based on the former Constitution, whose provisions had been swept away by the march of public opinion, which had been formulated in the new organic instrument.    But for such preconceived ideas it would have occurred to no one that a married woman was less competent to make contracts affecting her property than one who had not been married or who had

become a widow.  The requirement of the written assent of the husband to conveyances by the wife, was regarded by the Constitution as a sufficient guarantee of the rights of the husband.

The Code, Section 1256, in requiring the privy examination of the wife, is another instance of the same kind, for the Constitution guarantees the wife the right to convey her property, "with the written assent of the husband" (not with privy examination of the wife), "as if she were unmarried." The Legislature can not restrict the freedom given by the Constitution to the wife in dealing with her property, as to which her rights were to *"remain"* as if she were unmarried, save as to acquiring the written assent of the husband to her conveyances.  The Constitution says a married woman may convey her property with the written assent of her husband.  The Code, Section 1256, says she can not.  Which controls?

These two Sections (1256 and 1826) are the only ones which attempt to restrict the freedom of the wife's property rights (for Section 1246 (5) merely provides "when a privy examination is necessary" how it shall be taken), and neither of those Sections contain any basis for the theory of "a charge in equity" which is a reverter to a condition of things absolutely abolished by the Constitution, and to the times when a married woman was placed in the same class with "infants, idiots, lunatics and convicts."  The distinction between law and equity has been abolished, and in neither of the only two Sections dealing with the subject —1256 and 1826—antagonistic, though they be to the free control of their property, guaranteed married women by the Constitution—is there any hint of a return to the system of "charging the property" of a married woman any more than "if she had remained unmarried."

But if we are to concede that Section 1826 is not in conflict with the Constitution, yet, on its face, it does not restrict in the three cases therein specified, a married woman's right to make contracts affecting her property "real or personal." If she can do so as to personal property (as the opinion states) she can do so equally as to her realty.   This Section is the same as to both, and there is no other statute which makes a distinction, and the Constitution is still more liberal. Upon what then is based the doctrine that a married woman can not, in those three instances at least, make contracts affecting her real as well as her personal estate without the written assent of her husband?

The Legislature of 1899 struck "married women" out of the company and category of "infants, idiots, lunatics and convicts" in which classification they were placed by The Code, Sections 148 and 163, but the Courts have been still slower than the Legislature in grasping the fact of the emancipation of married women and of their property rights guaranteed them by the Constitution.   It is still held as law in North Carolina, strange as it may seem, not only that a married woman can not alien her property with merely "the written assent of her husband" as the Constitution says, but that her earnings from her own labor belong to her husband. In this connection it is appropriate to quote the following extract from 6 American Law Review, 72, (1871):

"Many of the States have passed statutes allowing married women to hold and manage property, and giving them a right to a greater or less extent to their separate earnings.   Such a law was passed in England in 1870.   We read in Gibbon that 'after the edicts of Theodosius had severely prohibited the sacrifices of the pagans, they were still tolerated in the city and temple of Serapis; and this singular indulgence was imprudently ascribed to the superstitious terrors of

WEATHERS *v.* BORDERS.

Christians themselves, as if they feared to abolish those ancient rites which could alone secure the inundations of the Nile, the harvests and the subsistence of Constantinople.' But the temple was at last destroyed and the statue of Serapis was involved in ruin.   It was confidently affirmed that if any impious hand should dare to violate the majesty of the god, the Heavens and the earth would instantly return to their original chaos.   An intrepid soldier animated with zeal and armed with a heavy battle axe, ascended the ladder; and even the Christian multitude expected with some anxiety, the event of the combat.   He aimed a vigorous stroke against the cheek of Serapis; the cheek fell to the ground; the thunder was still silent, and both the Heavens and the earth continued to preserve their accustomed order and tranquility.   The victorious soldier repeated his blows; the huge idol was overthrown and broken in pieces; and the limbs of Serapis were ignomiously dragged through the streets of Alexandria.'   The law of the status of woman is the last vestige of slavery.   Upon their subjection, it has been thought, rests the basis of society; disturb that, and society crumbles into ruins.   By the married woman's property acts, the first blow has been struck.   The cheek of the idol has fallen to the ground; the thunder is silent, and the earth preserves its accustomed tranquility.   The huge idol will sooner or later be broken in pieces."

In North Carolina, the Constitution of 1868 struck the last shackles from married women as regards their property rights.   It provides that her rights over her property "should be and remain" the same in all respects as if she were unmarried, save that in conveying her property there must be "the written assent of her husband."   Notwithstanding this emancipation, married women are still held in medieval leading strings by our Courts, and still wait for the salvation of Israel.   A married woman is still treated as one possessed of

no discretion.   We still talk of "charges upon her property"
when that is not required "if she remains single," and exact
"privy examination" when the Constitution requires it only
as to her consent to the conveyance by the husband of his
homestead.   We still hold that her husband is entitled to her
earnings, and though the statute says she can sue and be sued,
it is only recently that the Legislature has taken her as to the
Statute of Limitations, out of the classification with "con-
victs, idiots, lunatics" and those not arrived at years of dis-
cretion, and therefore not *sui juris.*

The rights of married women, like those of other classes,
are to be determined not by what "sages of the law" in a
former age thought good enough for them, but by the plain
provisions of a written Constitution.

DOUGLAS, J., concurring.   As the decision in this case
apparently depends upon my view of the law, it seems proper
that I should briefly state it in its moral as well as strictly
legal aspect.   In *Sanderlin v. Sanderlin,* 122 N. C., 1, and
in *Slocomb v. Ray,* 123 N. C., 571, in speaking for the Court,
I expressed my opinion of the law, but it is now urged that
those views are contrary to the spirit of the Constitution and
the enligtened progress of the age.   I certainly did not intend
the slightest reflection upon married women by continuing to
give them the same protection afforded to *"infants,* idiots,
lunatics and convicts;" nor have I heard any complaint from
those married women whose opinions would naturally
influence my conduct.   This protection was accorded to them
by the sages of the law for their benefit, and I see no reason
to take it from them simply because they share it with others,
some of whom may be less worthy than themselves.   The
mother, holding upon her lap the child to whom she has given
life, and for whom she would give her own life, feels that she

is in the best of company, far better than if she were with the so-called "reformer." She feels no degradation in being upon an equality with that "infant" in the love of a father and the protection of a husband; and her instincts would prompt her willingly to accord to the humblest convict the equal protection of the law. I am not an iconoclast, and I feel neither the desire nor the obligation to shoulder my judicial battle axe in a crusade against the wisdom of the ages. Much as I may admire Gibbons' intrepid soldier, who shattered with his battle axe the pagan idol, I can not regard the provisions of the common law as the off-spring of paganism and superstition. Even if my opinion in this case were otherwise, no matter how strong, the mere fact that it differed from the practical consensus of decisions would lead me to doubt its correctness; and while the conscience of the man must remain forever sacred, the individual opinion of the Judge on questions of law may well yield to superior wisdom and learning. It is true many of the rules of the common law, being fitted to then existing conditions, have become inapplicable to our present surroundings, and must be abandoned or reformed. The rules governing the ancient stage coach and mail driver must be refitted to the exigencies of the railroad and telegraph, while their views of the kingly prerogative find but little place in the government of a Republic. But while we have repudiated the Divine right of Kings, we still hold the diviner right of wife and mother.

· Having thus disposed of the *quasi* moral aspect of the case, at least to my own satisfaction, I can add but little to the opinion of the Court as delivered by Justice FURCHES, with which I fully concur. Article X, Section 6, of the Constitution, expressly provides that "the real and personal property of any female. .may be devised and bequeathed, and with the written assent of her husband conveyed by her as if

she were unmarried." As the written assent of the husband is necessary, I think it is clearly within the province of the Legislature to provide how that assent shall be legally expressed. I can not assent to the suggestion that this constitutional provision applies only to a conveyance in its strictly technical sense. I think it is equally applicable to any transaction that may naturally effect an alienation. Of what use would it be for the Constitution to prevent the wife from conveying the property and receiving the money therefor if it permitted her to spend the money and let the sheriff sell and convey the property? Such a construction of the Constitution would simply defeat its manifest intention.

I do not wish to be considered as opposing the legitimate progress of the age, but we should not forget that true progress depends more upon the direction in which we are going than it does upon the speed with which we are traveling. In some directions we may well say with the ancient philosopher, *"festina lente."*